PAUL ALAN LEVY
(pro hac vice)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, D.C. 20009
Telephone: (202) 588-7725
plevy@citizen.org

PHILLIP R. MALONE
California Bar No. 163969
JUELSGAARD INTELLECTUAL PROPERTY
  AND INNOVATION CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-1900
Facsimile: (650) 725-0253
pmalone@stanford.edu

Attorneys for Plaintiff Erik Anderson

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### San Jose  Division

| | | |
|---|---|---|
| ERIK ANDERSON, | ) | Case No. 5:19-cv-05630-EJD |
| | ) | |
| Plaintiff, | ) | **NOTICE OF MOTION AND MOTION** |
| | ) | **FOR ATTORNEY FEES AND COSTS** |
| v. | ) | |
| | ) | Hearing Date: August 27, 2020 |
| STEVEN HIRSCH and MARK SELIGER, | ) | Hearing Time: 9:00 a.m. |
| | ) | Courtroom: 4 - 5th Floor |
| Defendants. | ) | Judge: Honorable Edward J. Davila |

Please take notice that at 9:00 a.m. in  Courtroom 4 at 280 South 1st Street,  San Jose, on Thursday August 27, 2020, or such other date as the Court may set in light of the coronavirus situation, Plaintiff Erik Anderson will move the Court pursuant to section 505 of the Copyright Act to award him $62,992.50 in attorney fees and costs against Defendants Hirsch and Seliger, because Anderson is the prevailing party in this action, and Defendants' copyright infringement claims were unreasonable and were pursued in an unreasonable manner.

Plaintiff's counsel conferred with Defendants' counsel about the motion by telephone on April 13, and continued the discussion afterward by email, as well as by telephone conference calls on April 16, April 21, and May 1, but the parties have been unable to reach agreement on this matter.

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTS AND PROCEEDINGS TO DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. Proceedings to Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.        ANDERSON HAS PREVAILED IN THIS LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.      DEFENDANTS' COPYRIGHT CLAIMS WERE UNREASONABLE ON THE MERITS, AND WERE PURSUED IN AN UNREASONABLE MANNER, WARRANTING AN AWARD OF ATTORNEY FEES FOR REASONS OF COMPENSATION AND DETERRENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.      The Infringement Claims Against Anderson Were Unreasonable Because They Were Barred by Clear Ninth Circuit Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.      Defendants and Their Counsel Pursued These Unreasonable Claims in an Unreasonable Manner, Warranting an Award of Fees to Deter Excessive Enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    ANDERSON'S REQUESTED $62,992.50 IN ATTORNEY FEES AND COSTS ARE REASONABLE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**TABLE OF AUTHORITIES**

**CASES**

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 19

*Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
  571 U.S. 49 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bennett v. Franklin Res.*,
  2018 WL 6267693 (N.D. Cal. Nov. 30, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Biery v. United States*,
  818 F.3d 704 (Fed. Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Blum v. Stenson*,
  465 U.S. 886 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Brown v. Sullivan*,
  916 F.2d 492 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Buckhannon Board & Care Home v. W. Va. Department of Health & Human Resources*,
  532 U.S. 598 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13

*BWP Media USA v. Polyvore, Inc.*,
  922 F.3d 42 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*BWP Media USA v. T & S Software Associates*,
  852 F.3d 436 (5th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cadkin v. Loose*,
  569 F.3d 1142 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11

*Camacho v. Bridgeport Finance*,
  523 F.3d 973 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cantrell v. IBEW Local 2021*,
  69 F.3d 456 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Carter v. Incorporated Village of Ocean Beach*,
  759 F.3d 159 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*CoStar Grp. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Craig v. Popmatters Media*,
  — F. Supp. 3d —, 2020 WL 1933326 (N.D. Ill.  Mar. 23, 2020) . . . . . . . . . . . . . . . . . 21

*DL v. District of Columbia*,
  924 F.3d 585 (D.C. Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Design Basics v. Lexington Homes*,
  858 F.3d 1093 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Doc's Dream v. Delores Press*,
    No. 18-56073 (9th Cir. May 13, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings*,
    2019 WL 450882 (D. Ariz. Feb. 5, 2019),
    *appeal dismissed*, 2019 WL 2407327 (9th Cir. Mar. 15, 2019) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Experience Hendrix v. The James Marshall Hendrix Found.*,
    2005 WL 2922179 (W.D. Wash. Nov. 4, 2005),
    aff'd, 240 Fed. App'x. 739 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Flava Works v. Gunter*,
    689 F.3d 754 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

*Fox Broad. Co. v. Dish Network*,
    747 F.3d 1060 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*HTC Corp. v. Tech. Properties Ltd.*,
    2014 WL 3706617 (N.D. Cal. July 21, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Irvine Unified Sch. Dist. v. K.G.*,
    853 F.3d 1087 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*J.B. ex rel. H.S. v. San Jose Unified School Dist.*,
    2013 WL 1891398 (N.D. Cal. May 6, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kirtsaeng v. John Wiley & Sons*
    136 S.Ct. 1979 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 18

*Leonard v. Stemtech International*,
    834 F.3d 376 (3d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*MLTSHP, Inc. v. 7410, Inc.*,
    No. 2:20-cv-01258 (C.D. Cal. Feb 07, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*The Mockingbird Foundation v. Luong*,
    2020 WL 858099 (N.D. Cal. Mar. 9, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 14, 21

*NEXUS Services v. Moran*,
    2018 WL 1461750 (W.D. Va. Mar. 23, 2018),
    *aff'd*, 750 Fed. App'x. 241 (4th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Nutrivita Laboratories v. VBS Distrib.*,
    160 F. Supp. 3d 1184 (C.D. Cal. 2016),
    *Aff'd*, 697 Fed. App'x 559 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Oscar v. Alaska Dep't of Educ. & Early Dev.*,
    541 F.3d 978 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Penguin Group (USA) v. American Buddha*,
   2013 WL 865486 (S.D.N.Y. Mar. 7, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Perfect 10 v. Amazon, Inc.*
   508 F.3d 1146 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Perfect 10. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Prison Legal News v. Schwarzenegger*,
   608 F.3d 446 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Recouvreur v. Carreon*,
   940 F.Supp.2d 1063 (N.D. Cal. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ryan v. Editions Ltd. W.*,
   786 F.3d 754 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Schlossberg v. Luong*,
   Case No. 5:19-cv-02497-SVK (N.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Shin v. Plantronics*,
   2020 WL 510348 (N.D. Cal. Jan. 31, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Super. Consulting Services, Inc. v. Steeves-Kiss*,
   2018 WL 2183295 ((N.D. Cal. May 11, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*TC Heartland v. Kraft Foods Group Brands*,
   137 S. Ct. 1514 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*,
   489 U.S. 782 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*U.S. Rubber Recycling v. Encore Intern.*,
   2011 WL 311014 (C.D. Cal. Jan. 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*VHT, Inc. v Zillow Group*,
   918 F.3d 723 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Werner v. Complex Media*,
   2020 WL 1435180 (S.D.N.Y. Mar. 24, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

*Zenith Insurance Co. v. Breslaw*,
   108 F.3d 205 (9th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**STATUTES AND RULES**

Copyright Act,
     17 U.S.C. §§ 101 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 8, 11, 14, 22

     17 U.S.C. § 505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
28 U.S.C. § 1400 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
28 U.S.C. § 1400(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Federal Rules of Civil Procedure

     Rule 41(a)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     Rule 41(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**INTRODUCTION**

Plaintiff Erik Anderson filed this declaratory judgment action in response to repeated threats of litigation from defendants Steven Hirsch and Mark Seliger ("Defendants").  Once Anderson retained counsel and filed suit, Defendants filed a motion to dismiss; when it was denied, they backed down and issued broad, irrevocable, judicially enforceable licenses to Anderson for the use of all of their photos, not just those that were the subject of their initial threats.  Defendants' behavior reflects a tactic that their counsel, Mathew Higbee, has employed many times: using near-identical threats of litigation to exact payments from Internet users based on flimsy theories of copyright law—and then retreating when targets assert their rights. Indeed, as Judge Seeborg recently noted in a similar declaratory judgment action, Defendants' counsel is a "leading filer" of copyright infringement demand letters who has exhibited a pattern of threatening litigation and then dropping claims, decisions that "curiously coincide[] with the revelation each recipient [is] represented by counsel." *Mockingbird Found. v. Quang-Tuan Luong*, No. 19-CV-05671-RS, 2020 WL 858099, at *5 (N.D. Cal. Feb. 20, 2020).  Another court, having faced a blizzard of copyright cases filed by Mr. Higbee's firm, has bluntly raised the question whether one of its attorneys "may be deserving of the title 'copyright troll.'" *Werner v. Complex Media*, 2020 WL 1435180, at *2 (S.D.N.Y. Mar. 24, 2020).

The Copyright Act's fee-shifting provision is designed to encourage beneficial litigation and deter abusive litigation. *Kirtsaeng v. John Wiley & Sons*, 136 S. Ct. 1979, 1986 (2016); *see* 17 U.S.C. § 505.  In exercising their discretion to award fees to prevailing parties, courts consider the particular circumstances of the case, including the objective unreasonableness of the underlying copyright assertions.  Courts must also treat copyright plaintiffs and defendants alike in awarding attorney fees. *Kirtsaeng*, 136 S. Ct. at 1985. In seeking to end Defendants' baseless threats, Anderson brought precisely the kind of beneficial litigation the Copyright Act contemplates, and he prevailed.  Anderson successfully defended against a motion to dismiss and achieved the relief his lawsuit sought by obtaining an irrevocable, judicially enforceable license. That license effectively bars Defendants from filing a future lawsuit against Anderson over infringement claims involving the photos at issue or any of Defendants' other photographs, thus creating a final, material alteration in the legal relationship between the parties through the course of litigation.

As the prevailing party, Anderson is entitled to seek attorney fees and costs.  Defendants pursued unreasonable infringement claims—which were barred by clear Ninth Circuit caselaw—and did so in an

unreasonable manner.  Moreover, in accordance with the aims of the Copyright Act, fees are necessary to deter Defendants and the Higbee firm from continuing their pattern of threatening legally untenable copyright litigation.

**FACTS AND PROCEEDINGS TO DATE**

    **A.  Facts**

Because the facts and proceedings through the filing of Defendant's motion to dismiss were recounted in detail, with detailed citations to the record, in Plaintiff's opposition to the motion to dismiss as well as in the Court's March 9 ruling denying that motion, these matters are only summarized here.[1]

This proceeding was brought in response to a series of threatening letters and emails sent by the law firm of Mathew Higbee and Associates on behalf of defendants Hirsch and Seliger to plaintiff Anderson, a resident of Healdsburg, California.  Anderson operated the website AwardsWatch.com, which carries journalistic stories about the competitions for the Academy Awards and other entertainment industry awards. In addition to allowing readers of his articles to comment on those stories, Anderson also maintained a lively forum on a separate website, linked to from the AwardsWatch site, for public discussion of awards competitions.  As of last year, the forum carried roughly 2 million posts by about 8,000 separate users in 16,000 separate discussion threads.

Beginning in April 2019, Anderson received a series of threatening letters from Mathew Higbee, a California attorney, some mailed to Anderson's home in California and some attached to emails, as well as several emails and phone calls from Higbee firm employees.  The letters told Anderson that three separate "deeplinks"  had been located on the AwardsWatch forum that allowed forum users to see copyrighted photographs taken by two of the Higbee firm's clients.[2]  One letter complained about deeplinks to two different photographs by Mark Seliger, and another complained about a deeplink to a photograph by Steven

---

[1] Record citations include the First Amended Complaint ("FAC"); unless otherwise noted, the Anderson and Levy Affidavits cited in this section are the affidavits submitted with Plaintiff's opposition to the motion to dismiss.  Levy Second Affidavit refers to the affidavit submitted with this motion.

[2] A deeplink is a hyperlink to another web site where photographs are displayed. The link allows viewers of the AwardsWatch forum to see the photograph within the forum by "pulling" the image directly from the non-AwardsWatch server where it is hosted so that it is displayed to the viewers' personal devices.  FAC ¶ 17.

Hirsch.  The letters demanded payment of $17,000 and $6,750, respectively, and warned that if these sums were not paid promptly, Anderson's damages would "quadruple or more," he would be held liable for the Higbee firm's attorney fees, and he could face wage garnishments, liens on his property, and other costs.

Anderson had neither posted nor encouraged the posting of these deeplinks; in fact, he was unaware of the deeplinks or indeed of the forum posts containing them until the Higbee firm wrote to him in 2019.  FAC ¶ 20.  Although Anderson promptly told the Higbee firm that he was arranging to have the complained-of links removed, and that he had made no money from the alleged infringement, the Higbee firm persisted with a series of increasingly threatening emails and letters.  Some of these communications came from Mr. Higbee himself, some came from staff attorneys in the Higbee firm, and some from Higbee firm employees who identified themselves as "Compliance Resolution Specialists."  The emails warned Anderson that his only chance to escape with a relatively low payment as set forth in the demand letters was to make payment promptly.  Otherwise, the matter would be "escalated" to the law firm's litigation team.  In May and June 2019, the Higbee firm sent Anderson a pair of draft federal complaints with cover letters that warned they would be filed if Anderson did not pay the demanded amounts.  The first draft complaint (relating to Hirsch) bore a caption indicating that it would be filed in the Northern District of California, on the ground that Anderson is "a business entity incorporated in the State of California," that he "resides in this judicial district," and that he has a "regular and established place of business" in this district.  Anderson Aff., Ex. 7 ¶¶ 5-6.  The other draft complaint (relating to Seliger and sent 12 days after the Hirsch draft) bore a caption indicating that it would be filed in the Southern District of New York, on the (erroneous) grounds that Anderson "is a business entity incorporated in the State of New York," that he resides in the Southern District of New York, and that he has a "regular and established place of business" in the Southern District.  Anderson Aff. Ex. 8 ¶ 5-6.  (In fact, Anderson owned AwardsWatch personally, not through a corporation, and resided only in Healdsburg, California. FAC ¶ 7).  The draft complaints escalated the photographers' claims, seeking relief not just for the alleged infringement in the three photographs originally identified in the demand letters but also seeking injunctive relief against "infringement of all copyrighted works of the Plaintiff."  Initially, the two photographers' threats against Anderson were pursued separately.  But in the final email sent before this action was filed, the Higbee firm attorney who had threatened to file suit on Seliger's behalf in New York mentioned the threats to Anderson regarding the deeplink to a Hirsch

photograph, indicating that both would have to be resolved to avoid litigation.  Anderson Aff. Ex. 10.

Because Anderson was located in California and did not have a place of business anywhere else, because AwardsWatch was not incorporated anywhere, and because federal courts have exclusive jurisdiction in copyright litigation, any litigation they might file would be decided under Ninth Circuit copyright law precedents.  And as discussed below, Ninth Circuit law precludes the infringement claims that Seliger and Hirsch were asserting.  Indeed, as a result of previous communications, Levy Second Aff. ¶ 4 and Ex. M, the Higbee firm knew that these established precedents barred the copyright claims that they were asserting against Anderson.

**B. Proceedings to Date.**

On September 6, 2019, Anderson filed this action seeking a declaratory judgment that he was not liable for infringement of Defendants' copyrights.  But to further protect himself against claims based on future postings to the forum, Anderson gave up ownership of the forum to former volunteers who had helped him operate the forum.  FAC ¶ 15; Anderson Aff. ¶ 7.

Defendants' counsel offered to simplify the litigation and avoid discovery so that the legal issues could be decided in this Court and on appeal.  But his condition for keeping the litigation inexpensive was that Anderson drop any claim for attorney fees.  Levy Aff. ¶ 5.  When Anderson, having been threatened with exorbitant liability, refused to surrender his monetary claims against Defendants, their attorney, Mr. Higbee, executed a volte face. In a November 1 email, he insisted that the deeplinking on the AwardsWatch forum was infringement, claiming that the Ninth Circuit authority was wrong or distinguishable, and that Anderson could be held liable despite the Ninth Circuit's caselaw on volition.  However, he also claimed that his clients had now lost interest in pursuing the case because, he said, his firm had decided months earlier that Anderson was judgment-proof and hence his clients lacked the financial incentive to pursue litigation in which they could not recover any funds.  Therefore, he said, Hirsch and Seliger were issuing licenses to allow the three deeplinks that had been posted to the AwardsWatch forum, and he demanded that this suit be dismissed.  Levy Aff. ¶ 6 and Exh. B.

This offer, however, did not sufficiently protect Anderson's interests.  As the former host of a forum on which millions of posts have appeared, possibly including either posts or deeplinks to photographs taken by Seliger and Hirsch, Anderson's goal in pursuing this litigation had been to protect his legal interests and

1    bring an end to defendants' persistent threats by securing a court ruling establishing that any existing

2    deeplinks to Defendants' photographs had not infringed Defendants' copyrights and in any event that

3    Anderson was not liable for hosting such alleged infringement.

4        But the license Mr. Higbee was offering would allow Seliger and Hirsch to threaten and sue, again

5    and again if they chose, over deeplinking to any of Defendants' other photographs.  Anderson also knew

6    that, just a few days before, Mr. Higbee had stated his clients' willingness to pursue the litigation (so long

7    as Anderson's monetary claims against them were dropped).  And Anderson knew that, in a number of

8    past cases, Mr. Higbee had warned alleged infringers of his clients' copyrights that they could be sued for

9    alleged infringement occurring several years before.  Levy Aff. ¶¶ 22-23.  One of those threats had

10   been issued on behalf of Defendant Seliger.  *Id.* ¶ 23.

11       Accordingly, Anderson declined to dismiss the lawsuit, explaining that, once a concrete controversy

12   exists, the Supreme Court's ruling in *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013), does not permit a party

13   to moot litigation in which a case or controversy existed at the outset simply by ending its unlawful conduct.

14   Rather, the defendant then bears the "formidable burden of showing that it is absolutely clear the alleged

15   wrongful behavior could not reasonably be expected to recur."  Levy Aff. ¶ 7 and Ex. C, citing 568 U.S. at

16   91.  By email dated November 7, Mr. Higbee slightly expanded the license his clients were granting, but

17   because the license was still limited to three specific photographs, Anderson declined to dismiss unless

18   Hirsch and Seliger granted a license (or issued a covenant not to sue) that extended to any past deeplinking

19   on the AwardsWatch forum.  Levy Aff. ¶¶ 8-9 and Ex. D.  Anderson then amended his complaint to

20   specifically delineate the case or controversy that remained in the case.  DN 12.

21       At that point, Hirsch and Seliger could have granted the license needed to meet the *Already v. Nike*

22   standard, sparing Anderson and the Court the needless burden of continuing to litigate a case that Defendants

23   claim they did not want to pursue.  Instead, Defendants forged ahead with a motion to dismiss the amended

24   complaint as moot.  DN 16.  Their motion made no mention of *Already v. Nike*, and did not cite any cases

25   pertaining to whether and when voluntary cessation of challenged conduct can make a case moot; instead,

26   they cited only cases showing that a case or controversy must exist at the outset of litigation and throughout

27   the case.  They also argued that Anderson's transfer of ownership of the forum deprived him of standing to

28   seek a judgment of non-liability for deeplinks that had been posted while he owned the forum, without any

1   effort or citation to caselaw to explain how claims about past infringement by Anderson could have been

2   barred by a transfer of ownership.

3        In addition to ignoring the relevant law, the motion to dismiss rested on false factual assertions.  For

4   example, the motion asserted that Seliger and Hirsch had only complained about the hosting of three specific

5   photographs, DN 17 at 9, ignoring the draft complaints that they had sent demanding injunctive relief against

6   infringement of any of their copyrights works.  Anderson Aff. ¶¶ 3(g) and (h) and Ex. 7 and 8.  The motion

7   to dismiss also falsely claimed that Anderson had demanded legal protection for the deeplinking of

8   photographs taken by other Higbee firm clients.  DN 17 at 8-9.

9        This Court denied Defendants' motion to dismiss on February 20, 2020.  DN 27.  The Court made

10  short work of deciding that there was a live controversy in September 2019 when the case was filed, noting

11  that Defendants did not dispute the existence of a case or controversy at that time.  *Id.* at 6.  The question

12  then was whether the Hirsch and Seliger licenses mooted the litigation; the Court held that they did not.

13  Comparing the breadth of the covenant offered in *Already v. Nike* with the narrow license that defendants

14  had offered, the Court explained that the licenses were "confined to the three photographs identified in the

15  FAC," thereby "leav[ing] Anderson and forum users exposed to potential litigation and liability for deeplinks

16  to other copyrighted photos."  *Id.* at 7.  In fact, observing that there were millions of posts on the forum, the

17  Court noted that the proffered licenses "do not stop Defendants from simply finding another deeplink on the

18  forum and sending Anderson another threatening letter after the case is dismissed."  *Id.*  The very fact that

19  Defendants had refused to extend their licenses to their remaining photographs called into question their

20  motives, "which suggests that Defendants intended to preserve their right to file other suits against Anderson

21  in the event that they locate other deeplinks that were posted on the forum while Anderson was the

22  owner."  *Id.* at n.3.  Finally, the Court noted that Anderson had standing to seek declaratory relief against

23  claims that he was liable for anything posted while he owned the forum, because defendants "cite no legal

24  authority and offer no reason beyond mere conclusions to support their [standing] argument."  *Id.* at 8.

25        On March 10, 2020, Plaintiff's counsel notified Mr. Higbee that Anderson planned to file a motion

26  for summary judgment in time to have it considered at the Case Management Conference scheduled for

27  April 23, 2020.  Counsel also reiterated, as previously explained to Defendants' counsel in November, that

28  the complaint would be dismissed if his clients issued either an irrevocable license or a covenant not to sue

over the hosting of deeplinks to any Hirsch or Seliger photograph.  Levy Second Aff. ¶ 3 and Ex. L.
Defendants finally relented and issued irrevocable licenses on March 17, 2020.   DN 28-1.  They
acknowledged that they were issuing the licenses to avoid having to defend the copyright infringement
claims that they had previously asserted, and only because Anderson was seeking an award of attorney fees.
*Id.*  As a result of this broad irrevocable license, Anderson has now obtained an enforceable bar against
future litigation over the past posting of Defendants' photographs or any deeplinks to those photographs.

Having achieved success on the merits of the litigation, as sought by the First Amended Complaint,
Anderson filed a voluntary dismissal of the litigation on March 20, 2020, requesting that the Court approve
that dismissal.  The dismissal was so ordered on that same date.  The irrevocable license, which is judicially
enforceable against the defendant, has wrought a final and material change in the legal relationship between
the parties.  Consequently, Anderson now seeks an award of attorney fees and costs on the ground that he
has prevailed in the litigation, and that Defendants' infringement claims were both unreasonable on the
merits and pursued in an unreasonable manner. [3]

## I.   ANDERSON HAS PREVAILED IN THIS LITIGATION.

A successful declaratory judgment plaintiff can seek an award of attorney fees under the Copyright
Act, *Doc's Dream v. Delores Press*, No. 18-56073 (9th Cir. May 13, 2020), at * 13, and Anderson is the
prevailing party in this litigation.  To be a prevailing party, a litigant must show that the litigation produced
a "material alteration" of the "legal relationship of the parties.'"  *Cadkin v. Loose*, 569 F.3d 1142, 1148,
1149 (9th Cir. 2009) (citing *Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.*,
532 U.S. 598, 604 (2001)).  In *Cadkin*, the Ninth Circuit's leading decision on prevailing party status under
the Copyright Act, the plaintiff voluntarily dismissed the infringement litigation without prejudice.  The
Ninth Circuit held that such a dismissal did not make the defendant a prevailing party because the voluntary
dismissal did not alter the defendant's legal relationship vis-à-vis the plaintiff.  At the same time, *Cadkin*

---

[3] The other declaratory judgment action filed in this district over a Higbee firm demand to a different online forum host based on the posting of deeplinks was similarly resolved by the denial of a motion to dismiss on mootness grounds, followed by the issuance of an irrevocable license by the photographer involved in that case. *The Mockingbird Foundation v. Luong*, 3:19-cv-05671-RS, 2020 WL 858099, at *5 (N.D. Cal. Mar. 9, 2020).  Because of the limited income of the photographer-defendant in that case, the parties subsequently stipulated to an attorney fee award against him in the amount of $10,000.  *Id.*, DN 35.

1    indicated, through its approving citation of cases from other circuits, that a voluntary dismissal with

2    prejudice would make the defendant a prevailing party, in that the dismissal alone is sufficient to change the

3    legal relationship in defendant's favor.  *Id.* at 1149.  What the Ninth Circuit did not address in *Cadkin* is

4    whether, when a copyright declaratory judgment defendant issues an irrevocable license for the express

5    purpose of securing a voluntary dismissal of the declaratory judgment lawsuit without prejudice, that

6    exchange produces a material alteration in the parties' legal relationship that similarly warrants a conclusion

7    that the plaintiff is a prevailing party.  So far as Anderson's research has determined, that is an issue of first

8    impression.  As explained below, considerations of logic, precedent, and public policy warrant treating

9    Anderson as a prevailing party in this case given its atypical procedural posture.

10        A.   The "touchstone" of the prevailing party analysis is the material alteration of the legal

11   relationship between the parties.  *Irvine Unified Sch. Dist. v. K.G.*, 853 F.3d 1087, 1092 (9th Cir. 2017)

12   (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989)).  *Cadkin*

13   established that the key inquiry in the material alteration analysis is whether the parties remain "subject to

14   the risk of re-filing" of the claims.  569 F.3d at 1149 (quoting *Oscar v. Alaska Dep't of Educ. & Early Dev.*,

15   541 F.3d 978, 981 (9th Cir. 2008)).  Where that future risk has been eliminated, there is a clear material

16   change in the parties' relationship.  *Id.* at 1150.

17        Courts in the Ninth Circuit have held—based on *Cadkin* and longstanding precedent that a plaintiff's

18   voluntary dismissal with prejudice makes the defendant a prevailing party, *Zenith Ins. Co. v. Breslaw*, 108

19   F.3d 205, 207 (9th Cir. 1997) (abrogated on other grounds)—that when, in the usual procedural posture of

20   an infringement case, an intellectual property owner sues for infringement and then issues a covenant not

21   to sue (or simply stipulates to dismissal) with prejudice, the defendant becomes the prevailing party for

22   attorney fees purposes.  *See*, *e.g.*, *Nutrivita Labs. v. VBS Distribution*, 160 F. Supp. 3d 1184, 1190 (C.D. Cal.

23   2016), *aff'd*, 697 Fed. App'x. 559 (9th Cir. 2017) (holding that infringement plaintiff's stipulated

24   dismissal with prejudice, by which the plaintiff "agreed to never reassert these claims against [the defendant]

25   in federal court," was "a sufficient alteration in the parties' legal relationship to confer prevailing party

26   status" on the defendant under *Cadkin* and *Buckhannon*) (copyright and trademark claims); *DRK Photo

27   v. McGraw-Hill Glob. Educ. Holdings*, 2019 WL 450882, at *2 (D. Ariz. Feb. 5, 2019), *appeal dismissed*,

28   2019 WL 2407327 (9th Cir. Mar. 15, 2019) (copyright claims, citing *Nutrivita*); *Experience Hendrix v.*

1   *The James Marshall Hendrix Found.*, 2005 WL 2922179, at *6 (W.D. Wash. Nov. 4, 2005), *aff'd*, 240

2   Fed. App'x. 739 (9th Cir. 2007) (trademark claims).

3       Similarly, apart from the appellate decisions in copyright cases that were cited with approval in

4   *Cadkin*, courts of appeals in other circuits have held that the plaintiff's voluntary dismissal with prejudice

5   of suits brought under other statutes makes the defendant the prevailing party in the case.  *Carter v.*

6   *Incorporated Village of Ocean Beach*, 759 F.3d 159, 166 (2d Cir. 2014) (voluntary dismissal with prejudice

7   of some claims, atop summary judgment on others, made defendant the prevailing party on all claims);

8   *Cantrell v. IBEW Local 2021*, 69 F.3d 456, 458 (10th Cir. 1995) (en banc) (citing cases).  Although the

9   Ninth Circuit has never squarely confronted that issue in the copyright context, *Cadkin* contains strong

10   dictum that voluntary dismissal with prejudice would make the defendant a prevailing party by changing the

11   legal relationship among the parties.[4]   After all, *Cadkin* expressly approved of the Sixth and Seventh

12   Circuit's holdings that dismissal with prejudice makes the defendant the prevailing party in a copyright

13   infringement action. 569 F.3d at 1149.  That holding contrasts with the facts in *Cadkin* where the voluntary

14   dismissal was without prejudice.

15       But even dismissal without prejudice does not and should not categorically bar a prevailing party

16   determination in an appropriate case.  For example, Judge Illston, in another case with a "unique procedural

17   posture" where one party obtained "everything he wanted" and the other was "precluded from refiling,"

18   found that the party that obtained the relief he sought had a viable "claim that he was the prevailing party,

19   notwithstanding that the underlying case was dismissed without prejudice."  *J.B. ex rel. H.S. v. San Jose*

20   *Unified School Dist.*, No. C 12-06358 SI., 2013 WL 1891398, at *4 (N.D. Cal. May 6, 2013).

21       This, too, is a procedurally unusual case, but here it is Defendants who altered the legal relationship

22   _____

23       [4] Some district courts in patent cases, applying Federal Circuit law, have questioned whether
    a declaratory judgment defendant's grant of a covenant not to sue for infringement, and subsequent

24   dismissal of the action without prejudice, makes the plaintiff a prevailing party, at least when no
    infringement claims or counterclaims were ever first made against the declaratory judgment plaintiff.

25   *See, e.g.*, *HTC Corp. v. Tech. Properties Ltd.*, 2014 WL 3706617, at *4 (N.D. Cal. July 21, 2014);
    *U.S. Rubber Recycling v. Encore Intern.*, 2011 WL 311014, at *7-8 (C.D. Cal. Jan. 7, 2011).  But

26   those cases not only do not apply Ninth Circuit law, they also do not involve the facts presented here,
    where Defendants' counsel repeatedly threatened Anderson with suit and serious financial

27   consequences over alleged copyright infringement and even sent Anderson two draft infringement
    complaints that he said would be filed.

28

among the parties in favor of the plaintiff. Following Defendants' capitulation and issuance of broad irrevocable licenses—which expressly stated that they were for the purpose of ending the merits litigation—Anderson is no longer "subject to the risk of re-filing" of the claims that Defendants originally threatened, effectively satisfying the test that the Ninth Circuit articulated in *Cadkin*. 569 F.3d at 1149. In this case, the future risk of re-filing by Defendants has been eliminated. As a result, this litigation and the resulting judicially enforceable license have created a final, material change in the parties' legal relationship of the same sort that results when a copyright owner dismisses a suit with prejudice in a typical infringement case.

If this was a typical case—that is, if Defendants had followed through on their threats and sued Anderson for infringement and then subsequently relented by issuing identical licenses and dismissing their cases—Anderson would indisputably be the prevailing party. The outcome should be no different simply because the procedural posture of this case is reversed. When a declaratory judgment plaintiff like Anderson obtains through litigation a judicially enforceable license that fully and irrevocably ends the litigation and bars the copyright owner from pursuing any future infringement claims, the alteration in the parties' legal relationship in the alleged infringer's favor is identical. In either case, Defendants would thenceforth be legally barred—in one case by res judicata and in the other by the judicially enforceable license—from suing Anderson over the alleged infringement. Under these circumstances, that Anderson as a declaratory judgment plaintiff dismissed his case without prejudice should not affect this outcome.

As the Supreme Court held in *Fogerty v. Fantasy*, 510 U.S. 517 (1994), and reaffirmed in *Kirtsaeng*, the standards for awarding attorney fees under the Copyright Act should be neutral as between plaintiffs and defendants. 136 S. Ct. at 1985 (citing *Fogerty*, 510 U.S. at 527). Thus, when declaratory judgment defendants relinquish their copyright claims by making a judicially enforceable commitment not to pursue previously threatened infringement claims, the prevailing party determination should be just as favorable to a declaratory judgment plaintiff that has protected his rights as it would be to a defendant who has been sued for infringement. Accordingly, Anderson should be considered the prevailing party in this case.

B. The hesitancy of some district courts to recognize prevailing party status where a case was dismissed without prejudice was based, in part, on the proposition that a voluntary dismissal that is entered without a court order under Rule 41(a)(1)(ii), rather than being ordered pursuant to a court's discretion under

Rule 41(a)(2), generally does not have the judicial imprimatur required to make either side a prevailing party pursuant to the Supreme Court's reasoning in *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001). That concern is inapposite here. In *Buckhannon*, the Supreme Court refused to adopt the "catalyst" theory to grant attorney fees in a case where the state legislature triggered the relief sought by changing the underlying law. *Id.* at 603-05. The Court ruled that the change in law, which occurred due to the defendant's voluntary action **entirely outside the litigation**, did not effect a change in the legal relationship between the parties (that is, the West Virginia legislature could have changed its law again) and did not involve any judicial imprimatur. The chief concern with the catalyst theory was the administrability of courts inferring that events outside the litigation were due to the lawsuit itself.

This case is different. Here, the Court need not infer from the circumstances that events outside the litigation may have been caused by the litigation, and the case was not resolved by any extra-judicial events. Here, Anderson was forced to file and litigate a declaratory judgment action, and successfully obtained this Court's order denying Defendants' motion to dismiss that action. In light of that order, both Defendants granted an irrevocable and judicially enforceable license relieving Anderson of any liability for the very acts that were the basis for Defendants' threats of litigation. The licenses, which were submitted with the so-ordered dismissal, DN 28 and 28-1, also bar the filing of any future suit based on those acts, explaining in the license itself that the reason for the license was to end the litigation in plaintiff's favor. Unlike *Buckhannon*, here there was no change in the underlying law, but rather solely a change in the legal relationship of the parties as a direct result of actions within the litigation.

Accordingly, although demanding judicial imprimatur makes sense when mootness occurs because of changes outside the litigation, a formalistic, separate judicial imprimatur should not be required where, as here, a party granted an irrevocable license due entirely to events within the litigation and for the express purpose of securing dismissal of the declaratory judgment action, and where that license fully and finally effects a material alteration in the legal relationship between the parties. As the court said in *NEXUS Services v. Moran*, 2018 WL 1461750 (W.D. Va. Mar. 23, 2018), *aff'd*, 750 Fed. App'x. 241 (4th Cir. 2019):

> In the factual context of the *Buckhannon* case, it made sense to require "judicially sanctioned" relief. But where—like here and unlike *Buckhannon*—the change to the parties' relationship occurs in the lawsuit itself and finally and forever disposes of all claims raised in that litigation, there is a judicial imprimatur. Put differently, this court interprets *Buckhannon* as meaning that a "judicial imprimatur" results where the result is achieved

through the litigation, not outside of it as in *Buckhannon*.

*Id.* at \*14.

Under the circumstances of this case, as in *NEXUS*, a formalistic requirement of separate judicial imprimatur is inapposite.   And in any event, if the Court finds it necessary, imprimatur can be seen in the Court's opinion and order denying the motion to dismiss and explaining the insufficiency of Defendants' initial license.

C.   Recognizing Anderson as the prevailing party also reflects sound public policy.   There is a well-known problem of lawyers sending baseless demand letters and other legal threats for the purpose of exacting payments from innocent Internet users—all the while being prepared to back down when the target fights back with a declaratory judgment suit.   See *Design Basics v. Lexington Homes*, 858 F.3d 1093, 1097-98 (7th Cir. 2017) ("[O]pportunistic holders of copyrights, patents, and other intellectual property have developed unsavory reputations for 'trolling,' bringing strategic infringement claims of dubious merit in the hope of arranging prompt settlements with defendants who would prefer to pay modest or nuisance settlements rather than be tied up in expensive litigation. Like the proverbial troll under the bridge, these firms try to extract rents from market participants who must choose between the cost of settlement and the costs and risks of litigation."). Without counsel to advise them and protect their rights in court, these targets are likely to enter into the demanded licensing agreements at the cost of several hundred to thousands of dollars.   Unfortunately, the cost of retaining an attorney usually exceeds the demands, creating an enormous pressure to yield.   Levy Aff. ¶ 21.   By granting attorney fees in these situations, a court can deter parties and attorneys from engaging in such tactics.

To be sure, as Judge Seeborg of this Court recently noted in a parallel case with highly similar facts, *Mockingbird Found.*, 2020 WL 858099, at \*5 (N.D. Cal. Feb. 20, 2020), Defendants' counsel and his firm have a long history of issuing claims of infringement and demanding payment in amounts that, while considerable to many targets, are too small to justify retaining an attorney.   Mr. Higbee has acknowledged that his practice is to issue demand letters—even where litigation on the asserted claims could not possibly succeed—when his clients are determined to extract payments.   *See* Levy Aff. Ex. K.   And the temptations to abuse the process are seemingly enormous.   A Higbee firm recruitment video recently located on YouTube apparently portrays staff members whose job it is to intimidate demand-letter targets into paying

1
2

money to avoid "escalation" to litigation, Levy Aff. ¶ 21, as operating under "daily goals" that apparently expect them to earn their firm, jointly, roughly $100,000.  Levy Second Aff. ¶ 7 and Ex. P.

3
4
5
6
7
8
9

In these circumstances, if Defendants and their counsel are able to simply drop the claims and walk away every time a target files a protective declaratory judgment suit—as in  this case, as well as in *Mockingbird v. Luong*, *Schlossberg v. Luong*, No. 5:19-cv-02497 (N.D. Cal. May 8, 2019), and *MLTSHP, Inc. v. 7410, Inc.*, No. 2:20-cv-01258 (C.D. Cal. Feb 07, 2020)—they have no disincentive for continuing to make baseless, coercive threats of litigation.  *See* Levy Aff. ¶ 30.  Deeming Anderson a prevailing party, and therefore eligible for attorney fees, would deter copyright owners such as Defendants from engaging in the demand letter practice revealed on this record.  *See* DN 25, at 9.

10
11

**II.  HIRSCH'S AND SELIGER'S COPYRIGHT CLAIMS WERE UNREASONABLE ON THE MERITS AND WERE PURSUED IN AN UNREASONABLE MANNER, WARRANTING AN AWARD OF ATTORNEY FEES FOR COMPENSATION AND DETERRENCE.**

12
13
14
15
16
17

Having determined a party has prevailed within the meaning of the Copyright Act, courts make a particularized assessment to consider the unique circumstances, giving substantial weight to the objective unreasonableness of the non-prevailing party's copyright assertions.  *See Kirtsaeng*, 136 S. Ct. at 1986-88. This Court should award attorney fees to Anderson not only because Defendants' threats and demands were barred by more than a decade of Ninth Circuit precedent, but also because Defendants pursued these claims via harassing tactics that border on misconduct.

18

**A.    The Infringement Claims Against Anderson Were Unreasonable Because They Were Barred by Clear Ninth Circuit Precedent.**

19
20
21
22
23
24
25
26

Defendants Hirsch and Seliger could not have prevailed on the infringement litigation they threatened to file against Anderson.  In fact, their claims were barred by two clear lines of Ninth Circuit precedent: The first precludes infringement claims based on deeplinking, and the second rejects infringement claims that lack a volitional act as a proximate cause of the actual infringing activity.  Defendants knew about these precedents—in part because they were expressly told about them by Plaintiff's counsel—yet Defendants and their counsel nevertheless dogged Anderson with litigation threats and demands for payment over claims that were fundamentally untenable in the only venue in which they could have sued him for alleged infringement.

27
28

As a preliminary matter, Defendants' claims against Anderson would have to be assessed under

Ninth Circuit law based on fundamental tenets of civil procedure.  Anderson himself was located in this district, as the Higbee firm knew.  The firm mailed multiple letters to Anderson's home in Healdsburg and exchanged multiple emails in which Anderson disclosed his telephone number with a 415 area code.  Indeed, the draft complaint that the Higbee firm sent on Hirsch's behalf was captioned for filing in the Northern District of California and alleged jurisdiction and venue solely based on Anderson's location in this district. It alleged that Anderson "resides in" the Northern District, DN 21-1, Ex. 7, ¶ 6, that he has a "regular and established place of business" in this district," id., that he is "a business entity operating in the City of Healdsburg" and "conducted business within the City of Healdsburg," ¶ 9, and that he is "a business entity residing within the State of California," ¶ 10, hence that his infringement happened here. The draft complaint also alleged (erroneously) that Anderson is "a business entity incorporated in the State of California," ¶ 10, even though AwardsWatch was never incorporated.  In fact, Anderson has resided in Healdsburg and has operated AwardsWatch as a sole proprietorship at his Healdsburg home.  FAC ¶ 7.

Representing Seliger, by contrast, the Higbee firm sent Anderson a draft complaint that was captioned for filing in the Southern District of New York.  It inexplicably made erroneous assertions about Anderson's residence and place of business that Mr. Higbee knew, or at least should have known, were false. It claimed, wholly inaccurately, that Anderson resides in the Southern District of New York, that he has a regular and established place of business in the Southern District, Anderson Aff. Ex. 8 ¶¶ 5-6, and that he "is a business entity incorporated in the State of New York," even though Anderson did not reside or have a place of business in New York and is not incorporated.

These allegations were flatly contradicted by the assertions in the draft Hirsch complaint that had been sent 12 days earlier.  Moreover, having sent mail to Anderson's home in Healdsburg, and having called him at his Healdburg home using his 415 area code telephone number, FAC ¶¶ 12, 22, 25, 30, the Higbee firm knew that Anderson resided in California and not in New York.  Perhaps they did not look into the question of whether he was a sole proprietorship, but both New York and California make it easy to do corporation searches online, and had the Higbee firm looked, they would have learned that AwardsWatch was not incorporated.

Knowing that Anderson was in California, Seliger and Higbee should have recognized that Seliger could not have sued Anderson in New York for reasons of both venue and personal jurisdiction.  The

Copyright Code's venue provision allows suit only where the "defendant or his agent resides or may be found," 28 U.S.C. § 1400(a), which in this case is indisputably the Northern District of California.[5]  Second, New York's long-arm statute allows out-of-state defendants to be sued for torts having effects in the state of New York only when the defendant has a substantial revenue from interstate commerce, which Seliger could not have shown.  *Penguin Group (USA) v. American Buddha*, 2013 WL 865486, at *4-*6 (S.D.N.Y. March 7, 2013).   As the cases cited in *Penguin Group* indicated, "substantial revenue," generally requires annual interstate revenues in the five or even six figures, i.e., in excess of $10,000, and Seliger had no reason to think he could meet that test. *See* FAC ¶ 14.  To the extent the Defendants or their counsel assert they could have sued anywhere other than California under Ninth Circuit law, this jurisdictional claim itself is an unreasonable one.

Focusing on the Ninth Circuit, two lines of Circuit precedent bar the claims Defendants threatened against Anderson.  First, the Ninth Circuit held more than ten years ago that deeplinking to a photograph on a remote server does not constitute copyright infringement so long as the copyrighted image does not rest on the infringer's own server—the "server test."  *Perfect 10 v. Amazon, Inc.*, 508 F.3d 1146, 1160-63 (9th Cir. 2007).  The Ninth Circuit reaffirmed that precedent last year in *VHT, Inc. v. Zillow Group*, 918 F.3d 723 (9th Cir. 2019).  And yet, the only infringements that either Hirsch or Seliger alleged against Anderson was over deeplinking to a photograph on a remote server.  Mr. Higbee apparently had in mind to argue both that the Ninth Circuit's construction of copyright law was wrong and that its server test was limited to search engines.  Levy Aff. Ex. B.  Here, too, Defendants' counsel ignored that the Ninth Circuit has applied the server test beyond search engines.  *See VHT*, 918 F.3d 723 (applying the server test to a real estate marketplace website); *see also Flava Works v. Gunter*, 689 F.3d 754, 757 (7th Cir. 2012) (applying the server test to deny an infringement claim based on deeplinking by users of a social bookmarking service).

The Ninth Circuit has also rejected Defendants' theory that Anderson could be found liable for materials posted to its forum by third parties without Anderson's encouragement or awareness.  Any copyright infringement claim in the Ninth Circuit must show that a volitional act by the infringer was a

---

[5] Section 1400 supplants the general venue statute, section 1391, for patent and copyright lawsuits. *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 56 n. 3 (2013); *TC Heartland v. Kraft Foods Group Brands*, 137 S. Ct. 1514, 1519 (2017).

proximate cause of the alleged infringement. *Fox Broad. Co. v. Dish Network*, 747 F.3d 1060, 1067 (9th Cir. 2014).  In adopting this "volitional-conduct requirement," the Ninth Circuit is aligned with "every circuit to address this issue." *BWP Media USA v. T & S Software Associates*, 852 F.3d 436, 440 (5th Cir. 2017); *see also BWP Media USA v. Polyvore, Inc.*, 922 F.3d 42, 47 (2d Cir. 2019); *Leonard v. Stemtech Intl.*, 834 F.3d 376, 387 (3d Cir. 2016); *CoStar Grp. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004).  To be held liable for direct infringement for infringing materials posted by third-party users, a website host must have engaged in some volitional act that caused the infringement. There is no suggestion or evidence of any volitional act in this case. Anderson himself did not post the deeplinks to the copyrighted images.  Rather, forum users posted the deeplink and did so without any involvement by Anderson or even his knowledge until he received the demand letters.[6]

Moreover, Defendants' counsel were demonstrably aware of these disqualifying precedents, even as they threatened to sue Anderson if he did not pay over $20,000 in damages.  In fact, Anderson's counsel brought these lines of authority to the attention of Mr. Higbee.  First, in a prior case in which one of Mr. Higbee's clients threatened to sue for copyright infringement based on the hosting of a deeplink to a photograph, undersigned counsel Mr. Levy explained to Mr. Higbee how Ninth Circuit precedent barred

---

[6] A website host who derives direct financial benefit from the hosting of infringing content could under limited circumstances be liable on a claim for vicarious infringement. Defendants and their counsel never suggested while this case was pending on the merits that they had ever considered a theory of vicarious infringement. But Mr. Higbee has now, after the license was issued and the case dismissed, indicated that he plans to argue that, even if Defendants could not have established a direct infringement claim, he believed he could have prevailed on secondary infringement.  Unlike here, Mr. Higbee did make such an argument on behalf of another client who had sent demand letter to a hosting client in *MLTSHP, Inc. v. 7410, Inc.*, the case discussed in Levy Aff., Ex. K.  That argument could not possibly have worked against Anderson, because defendants could not reasonably argue that the presence of copyrighted material on the AwardsWatch forum was a "draw" for new users, as was the case for companies such as Grokster and Napster which provided a way to download music recordings for free instead of buying them. To establish vicarious infringement, Defendants would have had to show "that customers were drawn to [AwardsWatch's forum] because of the infringing [Seliger or Hirsch material] at issue." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017); see also Ex. K, where this argument was addressed at greater length.  Defendants had no evidence that even a single user was drawn to Anderson's forum by the presence of the two Seliger photographs or one Hirsch photograph, buried among the millions of posts on that forum, which the Higbee firm found only by using reverse image search software. Nor is such a "draw" plausible, considering that the photographs were available for viewing in the various publications to which Defendants had granted licenses.

such a claim.  Levy Second Aff., Ex M.  When Mr. Higbee persisted with his litigation threats in that case, the target of those threats sued Mr. Higbee's client for a declaratory judgment of non-infringement.  As his clients have done here, the Higbee client in that case promptly backed off and agreed not to seek relief.  Defendants and their counsel were, therefore, on notice that their claims based on deeplinking on forums could not be sustained.  Additionally, in a separate, later case, a lawyer from Mr. Higbee's firm admitted volition is a required element for any copyright claim.  In that case, the firm's client pursued similar threats of infringement litigation against the host of an image-sharing website.  There the lawyer conceded: "Volition being an element of Direct Infringement, we are not pursuing this claim on the basis of Direct Infringement alone."  See Levy Aff. ¶ 2 and Ex. K.  Thus, in this case, not only were the claims of infringement unreasonable as a matter of law, but Defendants' counsel knew that their threats were baseless.

### B. Defendants and Their Counsel Pursued Their Unreasonable Claims in an Unreasonable Manner, Warranting an Award of Fees to Deter Excessive Enforcement.

When deciding whether to award attorney fees, courts are also to consider the unreasonable manner in which parties pursue their copyright claims.  *Kirtsaeng*, 136 S. Ct. at 1988.  Courts may award attorney fees "to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims."  *Id.* at 1989.  From their first baseless demand letter to their under-researched and unsupported motion to dismiss, Defendants and their counsel have conducted themselves in an unreasonable manner that warrants an award of fees as deterrence for their overaggressive assertions.

First, on behalf of Defendants, the Higbee firm sent Anderson a series of emails threatening to file lawsuits that could not succeed.  They repeatedly threatened to "escalate" demands and indicated they might seize Anderson's personal assets and garnish his wages.  They further said they could seek up to $150,000 in statutory damages as well as attorney fees for pursuing claims, and that his financial exposure would quadruple unless he paid within a few days.  *Id.*  They did all this to increase the pressure on Anderson to pay money to which Hirsch and Seliger were not entitled under established law.

When these emails failed to secure the desired payments, Defendants threatened to sue Anderson in two separate district courts on opposite sides of the United States.  The two complaints made contradictory and irreconcilable allegations.  The draft complaint for filing in this Court on behalf of defendant Hirsch alleged that Anderson is a Californian located and operating a business in Healdsburg, California, DN 21-1,

Ex. 7, ¶¶ 5, 6, 7, and 9; then, less than two weeks later, the draft complaint for filing in the Southern District of New York on behalf of defendant Seliger alleged that Anderson resides in and operates a business in New York.  DN 21-1, Ex. 8, ¶¶ 5, 6, 7.  Defendants' counsel clearly had to know that one set of contradictory allegations was necessarily false; given the fact that Defendants' counsel sent mail to Anderson at a California address and called him using a California phone number, he knew where Anderson was.  Yet he nevertheless used both draft complaints to threaten Anderson.  The only reason for threatening to sue Anderson in two separate judicial districts based on contradictory allegations about where he lived would have been to increase the anticipated costs of defending against the claims, and hence increase even more the pressure to seek a settlement that would cost less than hiring two sets of lawyers to defend in two separate courts.

This pattern of conduct continued after Anderson filed this declaratory judgment.  Hirsch and Seliger insisted on offering a narrow license, confined to the individual photographs on which the initial threats of infringement litigation had been based, even after Anderson told them that an appropriately broader license would end the declaratory judgment action.  Defendants and Mr. Higbee then filed a motion to dismiss on mootness grounds, based only on cases addressing the need for a case or controversy at the outset of litigation.  They did so knowing, as this Court found in denying that motion, that there was a live case or controversy when the case was filed based on their original threats of litigation.  See DN 25 at 6.  And Defendants' counsel knew that the question of mootness was governed by Supreme Court's *Already v. Nike* decision, which plaintiff's counsel had explicitly cited in his November 6 letter to Mr. Higbee. Nevertheless, Defendants' motion did not address that case once or even mention the concept of voluntary cessation, much less try to explain how their limited license could constitute such cessation.   The motion also argued that Anderson lacked standing because he no longer owned the forum, without any effort or citation to caselaw to explain how Anderson could have avoided liability for past infringement simply by giving ownership to someone else.

In addition, while the motion to dismiss was pending, after refusing to meet and confer about case scheduling or about the Case Management Statement, Defendants waited until the very last minute before serving a draft response in which they declined to address the merits issues in the case but instead acted as if the existence of a case or controversy was the only issue disputed between the parties. Levy Second Aff.,

¶ 7 and Ex. P. [7]

Defendants' litigating position also rested on unsupported misstatements of fact.  For example, they claimed that they no longer wished to proceed on their claim for copyright infringement because Anderson was judgment proof.  Yet they had proposed in October 2019 that the parties litigate exactly that issue, so long as Anderson was willing to drop his claim for attorney fees.  Levy Aff. ¶ 5.  Defendants also falsely claimed, again without any citation to supporting evidence, that Anderson had declined to dismiss his complaint on mootness grounds unless he received a license (or covenant not to sue) extending to the posting of deeplinks to any photographs taken by any of the Higbee firm's photographer-clients. DN at 8-9. In fact, Anderson had only said that he needed a license as broad as the draft complaints that Defendants sent to him, i.e., licenses extending to all of the individual Defendants' copyrighted works.

It is apparent that the real reason why Defendants chose not to defend this case is not that they thought that Anderson is judgment-proof.  Rather, the reason why they abandoned their threats of litigation was that they were was facing a litigation adversary who had secured knowledgeable counsel, who would not be forced to abandon his rights to avoid paying legal bills at the rate of hundreds of dollars per hour, and who, therefore, could afford to maintain his meritorious defenses considering the applicable Ninth Circuit precedent.  This pattern of pursuing baseless demand letters, and threatening to impose the trouble and expense of litigation even when controlling Ninth Circuit precedent is against its clients, but withdrawing only when the firm learns that pro bono counsel are following the case, has continued even after this Court denied the motion to dismiss and expressed concern about the Higbee firm's pre-litigation demand letter practices.  Levy Second Aff. ¶ 6 and Ex. O.  Unfortunately, the two Defendants and their counsel want to continue threatening to sue other targets in the hope of pressuring them to pay damages.

Indeed, there is a plausible reason why Defendants suddenly became willing to issue the broader license that Anderson said he would accept on November 8, 2019: Courts have begun to catch on to the Higbee firm's status as a "leading filer" of copyright claims who engages in copyright trolling through the issuance of baseless demand letters on which they insist when targets have no counsel but which they withdraw when targets move to litigate.  *See, e.g.*, *Mockingbird Found. v. Luong*, 2020 WL 858099, at *5

---

[7] The document was not filed because, the day that the filing was due, Court canceled the scheduled Case Management Conference.

(N.D. Cal. Mar. 9, 2020).  The reason for granting the full license needed to moot this case was to reduce their attorney fee exposure.  It was, perhaps, the first reasonable thing they did in this case.

Still, this belated license should not insulate Defendants from attorney fee liability.  This step came too late to spare Anderson the necessity, burden, and expense of filing a complaint for declaratory relief and of successfully litigating a meritless motion to dismiss.  This litigation required a significant number of pro bono attorney hours to finally secure the substance of the relief sought in the complaint—judicially enforceable protection against being sued for infringement for hosting links to Hirsch's and Seliger's work.

*Kirtsaeng* instructs lower courts to consider excessive enforcement of copyright claims as a reason for awarding fees, and to take into consideration the need for compensation and deterrence.  The Higbee firm's demand letter practice, specifically as undertaken on behalf of Defendants Hirsch and Seliger—but also on behalf of many other clients—epitomizes the trolling practice at which this *Kirtsaeng* factor is directed.  Indeed, a judge for the Southern District of New York has called out one of the firm's attorneys for copyright trolling.  *See Werner v. Complex Media*, 2020 WL 1435180, at *2 (S.D.N.Y. Mar. 24, 2020)(finding the Higbee attorney's conduct "abuses the judicial process").  From his office in Utah, the attorney had filed about sixty copyright infringement cases in that district, then outsourced scheduling conferences to attorneys "ignorant of the most basic facts" of the case.  *Id.* at *1.  The court said it could not identify a single one of these cases that had been litigated to a conclusion on the merits, drawing "the unhappy conclusion that [the Higbee attorney] may be deserving of the title copyright 'troll.'"  *Id.* at *2.  Courts in other cases have found that "troll" behavior is a factor that justifies an award of attorney fees.  *See, e.g.*, *Craig v. Popmatters Media*, — F. Supp. 3d —, 2020 WL 1933326, at *1 (N.D. Ill.  Mar. 23, 2020) (one factor favoring fees was that "plaintiff's motivation in filing this action was to obtain proceeds from a settlement rather than to protect against infringing use of his copyright.")

Moreover, the financial incentive to engage in this sort of abuse is substantial, given the indications that Higbee staff members operate under goals that call for them to extract five or even six figures worth of a settlement dollars per day from demand letter recipients, Levy Second Aff. Ex. N, through their incessant emails threatening "escalation" to litigation, massive monetary awards, attorney fee awards, garnishment, liens and the like.  An award of attorney fees in this case would serve as a substantial counterincentive, which would discourage the deployment of these rent-seeking practices in cases when success on the merits

of litigation is highly unlikely.  An award here would give Defendants Hirsch and Seliger an incentive not to authorize their attorney to send out more baseless threats of infringement litigation, balancing the substantial monetary incentives that currently lead them to seek unjustified profits through their attorneys' abusive demand letter practice.

## III.   ANDERSON'S REQUESTED $62,992.50 IN ATTORNEY FEES IS REASONABLE.

As the prevailing party who obtained "excellent results," Anderson is entitled to a "fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).  *See also Fogerty*, 510 U.S. at 534 (applying *Hensley* to attorney fee determinations under the Copyright Act); *accord Ryan v. Editions Ltd. W.*, 786 F.3d 754, 762 (9th Cir. 2015).

The Ninth Circuit, like most circuits, determines attorney fee awards according to the lodestar method: The Court multiplies the number of hours reasonably spent on the litigation by the reasonable attorney fees, by reference to the market for attorney services in the community where the district court sits. *Camacho v. Bridgeport Fin.*, 523 F.3d 973, 979 (9th Cir. 2008).  For lawyers in public service or public interest practice, like Mr. Levy and Mr. Malone, the rate is determined by reference to market rates for lawyers of similar qualifications. *Blum v. Stenson*, 465 U.S. 886, 895-896 (1984); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010). Judges in this district often consult the Adjusted Laffey Matrix in determining reasonable market rates, including for undersigned counsel Mr. Levy.  *Recouvreur v. Carreon*, 940 F. Supp. 2d 1063, 1070 (N.D. Cal. 2013); *see also Bennett v. Franklin Res.*, No. 11-CV-05807-CRB, 2018 WL 6267693, at *4 (N.D. Cal. Nov. 30, 2018).  The Court of Appeals for the D.C. Circuit recently endorsed the use of this matrix, *DL v. District of Columbia*, 924 F.3d 585, 591 (D.C. Cir. 2019), as did the Court of Appeals for the Federal Circuit.  *Biery v. United States*, 818 F.3d 704, 714 (Fed. Cir. 2016).

Both Mr. Levy and Mr. Malone are attorneys with extensive experience and top credentials.  As the attached affidavits reflect, both Mr. Levy and Mr. Malone have spent their entire careers in public service and legal education.  Mr. Levy was graduated from the University of Chicago Law School; after clerking for the Honorable Wade H. McCree, Jr., on the United States Court of Appeals for the Sixth Circuit and following Judge McCree to the Solicitor General's Office, he has worked at Public Citizen for the past 42 years, except for one year on sabbatical to teach at Cardozo Law School.  Mr. Malone was graduated from

University of Arizona Law School in 1984; after spending twenty years litigating antitrust cases for the United States Department of Justice, Mr. Malone moved to Harvard Law School to be professor of law and director for the Cyberlaw Clinic, and then in 2013 to Stanford Law School where he has been professor of law and director of the Juelsgaard Intellectual Property and Innovation Clinic.

Based on their qualifications, Mr. Levy and Mr. Malone's reasonable rate is at least $775 per hour. A judge in this district set Mr. Levy's reasonable hourly rate at $700 a few years ago, resting in part on the Adjusted Laffey Matrix. *Recouvreur*, 940 F. Supp. 2d at 1070. Since that determination, the reasonable rates identified by the Adjusted Laffey Matrix have continued to climb, and currently suggest $899 per hour for lawyers who have been practicing for more than twenty years, as Mr. Levy and Mr. Malone both have. *See* Laffey Matrix, http://www.laffeymatrix.com/see.html. Judges in this district have recently found comparable hourly rates to be appropriate. *See*, *e.g.*, *Shin v. Plantronics*, 2020 WL 510348, at *1 (N.D. Cal. Jan. 31, 2020) (finding an hourly rate of $850 to be reasonable for senior lawyers); *Super Consulting Services v. Steeves-Kiss*, 2018 WL 2183295, at *6 (N.D. Cal. May 11, 2018) (approving an hourly rate of $785 for a senior partner with 32 years of experience and noting that recent awards in this district ranged from $490 to $975 for partners).

The number of hours claimed is also reasonable and well-supported by the affidavits of Mr. Levy and Mr. Malone. As shown by the affidavits, counsel have exercised billing judgment by seeking fees only for time spent by Anderson's lead counsel in both Washington, D.C., and Stanford. They have not billed for the substantial amounts of time spent by some of Mr. Levy's colleagues at Public Citizen. Moreover, several California Bar Certified Law Students at the Juelsgaard Clinic bore significant responsibility for papers filed in this case under Mr. Malone's supervision. (The Malone affidavit, ¶ 12, describes the manner in which he exercised billing judgment with respect to the time the students recorded on this case.) If this work had not been completed by students, it would have been completed by Mr. Malone or Mr. Levy at significantly higher rates.

The total time sought for the work of Plaintiffs' counsel as follows:[8]

---

[8] The time sought includes work done on the fee application. *Brown v. Sullivan*, 916 F.2d 492, 497 (9th Cir. 1990) ("[W]hen fees are available to the prevailing party, that party may also be awarded fees on fees . . . ."). However, the chart breaks out the time spent on the fees issues.

| Lawyer | Hourly Rate | Merits Hours | Fees Hours | Total Fee |
|---|---|---|---|---|
| Levy | $775 | 32.8 | 14.5 | $36657.50 |
| Malone | $775 | 18.25 | 7.5 | 19956.25 |
| Students | $125 | 31.5 | 13.85 | 5668.75 |
| Total | | 82.55 | 35.85 | $62282.50 |

In addition, plaintiff seeks to be awarded $710 in expenses, for the filing fee and Mr. Levy's pro hac vice fee, both which are documented in the affidavits of counsel.

**CONCLUSION**

The motion for an award of attorney fees and costs, in the amount of $62,992.50, should be granted.

Respectfully submitted,

DATED: May 22, 2020

PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, D.C. 20009

By:    /s/ Paul Alan Levy
(pro hac vice)
Telephone: (202) 588-7725
plevy@citizen.org

JUELSGAARD  INTELLECTUAL  PROPERTY AND INNOVATION CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610

By:    /s/ Phillip R. Malone
California Bar No. 163969

Telephone: (650) 724-1900

pmalone@stanford.edu